United States District Court
Southern District of Texas
**ENTERED**
July 25, 2017
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| STARR SURPLUS LINES INSURANCE CO., § § Plaintiff, § § v. § § SEIBERT ENTERPRISES, LLC, § § Defendant. § | CIVIL ACTION NO. H-16-3490 |

**MEMORANDUM AND OPINION**

Starr Surplus Lines Insurance Company sued its insured, Seibert Enterprises, seeking a declaratory judgment that it has no duty to defend or indemnify Seibert in an underlying lawsuit. The underlying suit alleged that Seibert, a roofing company, failed to have a working fire extinguisher at hand when it did "torch work" on a roof. The suit alleged that Seibert's torch work ignited a fire that spread because there was no working fire extinguisher. Starr Surplus contends that Seibert's failure to have the extinguisher relieves Starr Surplus of any duty to defend or indemnify.

The parties filed cross-motions for summary judgment on whether Starr Surplus has a duty to defend and indemnify in the underlying lawsuit. (Docket Entry Nos. 22, 25). Based on a careful review of the pleadings; the motions, responses, and reply; the record; the arguments of counsel; and the relevant law, the court grants Seibert's summary judgment motion, (Docket Entry No. 25), and denies Starr Surplus's cross-motion, (Docket Entry No. 22). The reasons are explained in detail below. A status conference is set for **August 2, 2017 at 10:00 a.m.** to address the remaining issues in this case.

**I.    Background**

Starr Surplus issued Seibert a Commercial General Liability policy. (Docket Entry No. 1

at ¶ 10). In September 2016, Valley Forge Insurance Company, as subrogee of ADB Commercial Construction, Inc. and as assignee of James Coney Island, Inc., sued Seibert in Texas state court. (Docket Entry No. 1, Ex. A). ADB Commercial Construction had contracted with James Coney Island, Inc., which owned hot-dog restaurants in Houston, to remodel the restaurant's exterior. (*Id.* at ¶ 9). James Coney Island and ADB Commercial Construction entered into a second contract for roof repairs. (*Id.*). ADB Commercial Construction in turn subcontracted some of the roof work to Seibert. (*Id.* at ¶ 10).

The subcontract required Seibert to install a new base sheet to the walls, apply asphalt primer to old field membrane as needed, install flashing to cover the new modified primer, and to "torch down" the new modified membrane or modified bitumen product. (*Id.*). "Torching" or "torch down" operations include using a wand, an open flame, a torch, or other electric or gas-powered heated appliance on a roof. (*Id.*). Torching is often used to install or repair flat roofs like the one on the James Coney Island restaurant. (*Id.*). Valley Forge alleged that torching operations on a roof are inherently dangerous, particularly in a South Texas summer, and that the risk of fire is both high and highly foreseeable. (*Id.* at ¶ 11).

Valley Forge included the following allegations in its state-court petition against Seibert:

> On the morning of September 9, 2014, while performing torching operations to the roof using a propane gas torch, SEIBERT's personnel caused a fire to erupt by igniting initially the fiberglass installation along the parapet wall, which fire spread behind the wood framing and extended along the parapet wall. The fire, with the resultant smoke and water penetration, resulted in extensive damage to the JCI restaurant, including extensive damage to the electrical wiring, the HVAC system, and interior walls and ceiling tiles, which caused the restaurant to close down for several months with the resultant loss of at' least $443,000 in business income, with restoration expenses themselves amounting to over $86,000.00. There was also smoke and water damage to restaurant food items as well as fire and related damage, including discoloration of the brick exterior and holes at various places that were necessary to be punched by the Houston Fire Department in order to locate, confine

and extinguish the fire, to the interior ceilings, exterior walls, and the roof itself.

(*Id.* at ¶ 12). Valley Forge also alleged that:

> It was later determined that SEIBERT had not taken proper precautions in performing the torching operations and in containing the fire once it began. For example, once the fire started the fire extinguisher that the SEIBERT work crew had on the roof did not work. The crew had to frantically leave the restaurant roof and attempt to extinguish the fire with a hose. This delay in being able to contain the fire once it started facilitated the spread of the fire on the roof, into the interior walls, and elsewhere. SEIBERT did not have available a working fire extinguisher to be used by those skilled in torching operations, and neither did it have readily available a charged hose, redundant fire extinguishers, or other customary firefighting equipment that would mitigate any fire loss. SEIBERT was solely responsible for causing and in failing to contain the fire.

(*Id.* at ¶ 13). Valley Forge paid its insured, ADB Commercial Construction, $529,135.15 under the policy for the losses from the fire and smoke damage to the restaurant. (*Id.* at ¶ 17).

On September 8, 2016, Valley Forge Insurance sued Seibert in Texas state court, as the subrogee of ADB Commercial Construction and the assignee of James Coney Island. (Docket Entry No. 1, Ex. A). Valley Forge asserted common-law claims for negligence and negligent trespass, strict liability, breach of common-law express and implied warranties, and breach of the construction subcontract between ADB Commercial Construction and Seibert, as well as statutory violations of the DTPA. Starr Surplus filed this federal diversity jurisdiction coverage suit on November 23, 2016, seeking a declaratory judgment that it has no duty to defend or indemnify Seibert for the claims Valley Forge asserted against it in the underlying suit. (Docket Entry No. 1). Starr Surplus moved for a summary judgment that it had no duty to defend. (Docket Entry No. 22). Seibert cross-moved for a summary judgment that Starr Surplus owes Seibert a duty to defend and indemnify in the underlying suit. (Docket Entry No. 25). The court heard oral argument on the cross-motions. (Docket Entry No. 31). The parties' motions and briefs, counsels' arguments, the pleadings, and the

record evidence are analyzed under the applicable legal standards.

## II.     The Legal Standards

### A.     Summary Judgment

"Summary judgment is required when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting FED. R. CIV. P. 56(a)). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Id.* (quotation marks omitted); *see also Celotex*, 477 U.S. at 325. Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the

4

motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

"Once the moving party [meets its initial burden], the non-moving party must 'go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" *Nola Spice*, 783 F.3d at 536 (quoting *EEOC*, 773 F.3d at 694). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary-judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008); *see also Nola Spice*, 783 F.3d at 536.

When the parties cross-move for summary judgment, the court must review "each motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Mid–Continent Cas. Co. v. Bay Rock Operating Co.*, 614 F.3d 105, 110 (5th Cir. 2010) (alteration omitted) (quotation marks omitted).

### B.     The Duty to Defend

The insured initially has the burden to plead and prove that an insurance policy covers the benefits sought. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Penn. v. Puget Plastics Corp.*, 532 F.3d 398, 401 (5th Cir. 2008). If an exclusion is asserted, the insurer has the burden of showing that

the exclusion applies. *See id.* at 404. If the insurer meets this burden, the insured must show that the claim does not fall within the exclusion or that it comes within an exception to the exclusion. *See Century Surety Co. v. Hardscape Constr. Specialties, Inc.*, 578 F.3d 262, 265 (5th Cir. 2009).

Whether an insurer has a duty to defend is distinct from whether the insurer has a duty to indemnify. *D.R. Horton-Tex., Ltd. v. Markel Int'l Ins. Co.*, 300 S.W.3d 740, 743 (Tex. 2009). To determine whether an insurer has a duty to defend, Texas courts apply the "eight-corners rule." That rule "provides that when an insured is sued by a third party, the liability insurer is to determine its duty to defend solely from [the] terms of the policy and the pleadings of the third-party claimant." *GuideOne Elite Ins. Co. v. Fielder Road Baptist Church*, 197 S.W.3d 305, 307 (Tex. 2006). The court compares the "four corners" of the pleading with the "four corners" of the policy. *Allstate Ins. Co. v. Disability Servs. of the Sw. Inc.*, 400 F.3d 260, 263 (5th Cir. 2005) (applying Texas law). "Resort to evidence outside the four corners of these two documents is generally prohibited." *Id.* When the eight-corners rule applies, the court does not examine the merits of the underlying dispute or evidence extrinsic to the policy and the pleadings.

Whether the insurer must defend is determined as a matter of law because the court need only examine the policy language and the allegations in the underlying lawsuit's pleading to make the decision. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Penn. v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997) (per curiam). The court construes the policy language and then examines the factual allegations in the underlying suit to determine whether those allegations state a claim covered by the policy. *See id.* An insurer has no legal obligation to defend a suit if the underlying petition does not allege facts within the scope of coverage. *King v. Dallas Fire Ins. Co.*, 85 S.W.3d 185, 187 (Tex. 2002). Doubts are resolved in favor of the duty to defend. *Id.*

**III.     Analysis**

The parties' dispute centers on the following policy provisions:

Roofing Operations—Limitation of Coverage Endorsement

2.      Hot Tar or Torch-Down Work

>        . . .
>
>        c.      The insured will have at hand a functional, fully charged 15 lb. or larger dry chemical fire extinguisher during any hot tar or "torch-down" process work.
>
>        d.       If the insured fails to meet any of the conditions stated above, any resulting "bodily injury" and/or "property damage" to any building or structure or its contents will not be covered by this policy.
>
>        . . .

(Docket Entry No. 24-2 at 57–58).  The policy defines "torch down" to mean "roofing operations involving any wand, open flame, torch or heated applications used on roofing or membrane roofing." (*Id.* at 57).  The policy defines "property damage" to mean:

>   a.      Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
>   b.      Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(*Id.* at 38).

In the underlying lawsuit, Valley Forge alleged that Seibert did not have a working fire extinguisher on the roof during the torching work.  In this declaratory-judgment action, Starr Surplus points to Clause 2(c), which required Seibert to have a "functional" fire extinguisher "at hand" during the "torch-down" work.  Starr Surplus argues that Seibert's failure to comply with that condition relieves Starr Surplus from any duty to defend under Clause 2(d), which states that "[i]f

7

the insured fails to meet any of the conditions stated above, any resulting . . . 'property damage' to any building or structure or its contents will not be covered by this policy."

Seibert responds that even if some of the fire damage is excluded from coverage because it resulted from Seibert's failure to have a working fire extinguisher, which allowed the fire to spread, Starr Surplus still has a duty to defend because the underlying lawsuit also alleges that the fire ignited and initially spread for reasons unrelated to the absence of a working fire extinguisher. Seibert contends that the property damage from the fire initially igniting and spreading was not damage "resulting from" Seibert's failure to have a working fire extinguisher. The dispute comes down to whether the policy excludes only property damage that "result[ed] from" the lack of a working fire extinguisher, or if the mere failure to have a working fire extinguisher relieves Starr Surplus of any duty to defend.

Starr Surplus points to several cases in support of its position, but the policy language in each case is different than the policy language here. For example, in *Ewell v. Those Certain Underwriters of Lloyd's, London*, 2010 WL 3447570 (Del. Super. Ct. Aug. 27, 2010), the policy stated: "You must ensure that visible and accessible fire extinguishers be placed on each level of the dwelling. Failure to comply with this condition will render this insurance null and void." *Id.* at 1. Given the unambiguous policy language, the court found as a matter of law that the plaintiff's failure to have working fire extinguishers in the home made the insurance contract void and defeated coverage. *Id.* at 4. In *Lloyd's of London v. Pagan-Sanchez*, 539 F.3d 19, 22 (1st Cir. 2008), a warranty provision in a maritime insurance contract stated: "If the scheduled vessel is fitted with fire extinguishing equipment, then it is warranted that such equipment is properly installed and is maintained in good working order. This includes the weighing of tanks once a year and recharging as necessary." *Id.*

8

at 22. Although the marine insurance contract did not exclude coverage for breach of the warranty, the governing law provided that "a breach of a promissory warranty in a maritime insurance contract excuses the insurer from coverage." *Id.* at 24. No such language is present here.

Starr Surplus also points to *Mt. Hawley Ins. Co. v. Nat'l Builders LLC*, 2009 WL 1919611, at \*1 (S.D.N.Y. June 30, 2009) and *Mt. Hawley Ins. Co. v. Pallet Consultants Corp.*, No. 06-61763-CIV, 2009 WL 9575832, at \*1 (S.D. Fla. June 26, 2009). The policy language in these two cases is different from the policy at issue here. Both cases involve a failure to meet what the polices made a condition for coverage. In one case, the policy stated that "failure to comply with the above conditions will suspend all insurance provided by this policy during the term of such noncompliance." *Pallet Consultants Corp.*, 2009 WL 9575832, at \*1. In the other case, the policy stated that "[i]n the event that the insured failed to comply with the above conditions for a subcontractor whose work directly or indirectly gives rise to a claim, coverage for such a claim will be voided under this policy." *Nat'l Builders LLC*, 2009 WL 1919611, at \*1. In both cases, the courts found that the policies clearly made noncompliance with the condition a basis to suspend or void coverage. The policy here is more limited. It states: "If the insured fails to meet any of the conditions stated above, any *resulting* . . . 'property damage' to any building or structure or its contents will not be covered by this policy." (Docket Entry No. 24-2 at 57–58) (emphasis added).

Starr Surplus relies on a more recent Fifth Circuit case, but that case supports Seibert's argument. In *Scottsdale Ins. Co. v. Logansport Gaming, L.L.C.*, 556 F. App'x 356 (5th Cir. 2014), the insurance policy excluded coverage for "damage caused by or resulting from fire if, prior to the fire" the insured did not maintain a fire-suppression system in complete working order. *Id.* at 358. That policy language excluded coverage for damage "caused by or resulting from fire" if there was

9

no working fire-suppression system in place. The clause at issue excludes only property damage "resulting from" the failure to have a working fire extinguisher at hand. This distinction is important. *Scottsdale* excludes coverage for any damage caused by fire if a working fire-suppression system was not in place. Here, the policy excludes coverage for damage only resulting from the failure to have a fire extinguisher.

Seibert's policy construction requires a causal connection between the failure to have a working fire extinguisher and the property damage. This construction is consistent with the policy language and case law. Starr Surplus's interpretation eliminates the causal connection —"any resulting . . . property damage"—between the failure to have a working fire extinguisher at hand and the property damage. Starr Surplus's argument asks this court to rewrite the policy language it drafted to have the same meaning as the much broader policy exclusions in the cases it cites. The policy language here is narrower. The policy here excludes coverage only for property damage that results from the failure to have a working fire extinguisher at hand. The policy does not exclude or void coverage merely because of the failure to have the extinguisher.

Starr Surplus argues that even if Seibert's construction is correct, the underlying petition alleges that at least some of the property damage resulted from the failure to have a working fire extinguisher. Seibert does not dispute that. The petition states:

> "Seibert had not taken proper precautions in performing the torching operations and in containing the fire once it began. For example, once the fire started the fire extinguisher that the Seibert crew had on the roof did not work. The crew had to frantically leave the restaurant roof and attempt to extinguish the fire with a hose. This delay in being able to contain the fire once it started facilitated the spread of the fire on the roof, into the interior walls, and elsewhere. Seibert did not have available a working fire extinguisher to be used by those skilled in torching operations, and neither did it have readily available . . . redundant fire extinguishers . . . that would mitigate any fire loss. Seibert was solely responsible for causing and in failing to contain the fire."

(Docket Entry No. 1, Ex. A at ¶ 13). This section of the petition seeks some damages that Seibert concedes fall within the policy exclusion for property damage resulting from the failure to have a working fire extinguisher at hand. That damage resulted from Seibert's inability to promptly contain, then extinguish, the fire. But this is not all the property damage that the underlying petition alleged. Seibert points to the section of the underlying suit's petition alleging that Seibert personnel negligently started the fire by igniting the fiberglass installation along the parapet wall:

> "On the morning of September 9, 2014, while performing torching operations to the roof using a propane gas torch, SEIBERT's personnel caused a fire to erupt by igniting initially the fiberglass installation along the parapet wall, which fire spread behind the wood framing and extended along the parapet wall."

(*Id.* at ¶ 12).

This section of the petition does not allege that the property damage from the initial ignition and spread of the fire resulted from the failure to have a working fire extinguisher at hand. The property damage resulting from the initial fire ignition and spread is not excluded from coverage. By contrast, the sections of the petition alleging that the failure to have a working fire extinguisher delayed efforts to extinguish or contain the fire, and allowed the fire and smoke to spread throughout the restaurant does allege property damage resulting from Seibert's failure to have a working fire extinguisher. This damage is excluded from coverage.

Under Seibert's proposed policy construction, although part of the damages alleged is within the exclusion, part of it is not. The distinction is between the property damage resulting from the allegedly negligent Seibert personnel acts that started the fire and its initial spread on the one hand, and the property damage resulting from the failure to have a working fire extinguisher and the delay that allowed the fire to spread on the other hand.

The court recognizes that the amount of covered property damage resulting from the initial ignition and spread of the fire may be small in comparison to the excluded property damage resulting from the failure to have a working fire extinguisher at hand.  At the hearing in which counsel argued the summary judgment motions, the court asked the parties to brief whether there is a *de minimis* exception to the general rule that a "duty to defend any of the claims against the insured requires the insurer to defend the entire suit." *Gehan Homes, Ltd. v. Employers Mut. Cas. Co.*, 146 S.W.3d 833, 838 (Tex. App.—Dallas 2004, pet. denied).  The parties did not find any case law or other support for a *de minimis* exception.  (Docket Entry Nos. 32, 33).  Starr Surplus cited cases on concurrent causation, (Docket Entry No. 32), but these cases involved two separate independent causes of the entire harm, which is not alleged here. *See Travelers Indem. Co. v. Citgo Petroleum Corp.*, 166 F.3d 761, 769–72 (5th Cir. 1999) ("The cause of the accident was Wright's negligent operation of the truck . . . [w]ithout that negligence . . . any antecedent error" by Citgo by failing to prevent the negligent operation of a truck "could not have caused the injury"); *Commercial Union Ins. Co. v. Roberts*, 7 F.3d 86, 88–89 (5th Cir. 1993) ("The claims of negligence are not independent causes-in-fact of the injuries" and the "intentional acts and negligent acts converge."); *Burlington Ins. Co. v. Mexican Am. Unity Council, Inc.*, 905 S.W.2d 359, 362–63 (Tex. App.—San Antonio 1995, no writ) (no duty to defend because the negligence and assault and battery allegations "are related and interdependent" and "[w]ithout the underlying assault and battery, there could have been no injury and no basis for suit"); *N. Assur. Co. of Am. v. EDP Floors, Inc.*, 533 A.2d 682, 688–89 (1987) (no duty to defend because the policy excluded coverage for bodily injury "arising out of" unloading a vehicle "regardless of whether the injury may also be said to have arisen out of other causes further back in the sequence of events").

In this case, by contrast, the underlying petition alleges that Seibert's negligence in performing the torch work on the roof caused the initial fire and its spread along the parapet wall. (Docket Entry No. 1, Ex. A at ¶ 12). This allegation makes clear that the fire started and initially spread for reasons unrelated to the absence of a working fire extinguisher. This allegation could serve as a separate basis for suit. Because "[a] duty to defend any of the claims against the insured requires the insurer to defend the entire suit," Starr Surplus owes Seibert a duty to defend in the underlying suit. *Gehan Homes, Ltd.*, 146 S.W.3d at 838; *see also Gore Design Completions, Ltd. v. Hartford Fire Ins. Co.*, 538 F.3d 365, 369 (5th Cir. 2008) ("When in doubt, defend."). The indemnification question is left for another day. "In contrast to the duty to defend, the duty to indemnify only arises after an insured has been adjudicated, whether by judgment or settlement, to be legally responsible for damages in a lawsuit." *Collier v. Allstate County Mut. Ins. Co.*, 64 S.W.3d 54, 62 (Tex. App.—Fort Worth 2001, no pet.).

Seibert's summary judgment motion is granted, (Docket Entry No. 25), and Starr Surpus's cross-motion is denied, (Docket Entry No. 22).

## IV. Conclusion

Seibert's summary judgment motion is granted, and Starr Surplus's cross-motion is denied. (Docket Entry Nos. 22, 25). A status conference is set for **August 2, 2017 at 10:00 a.m.** to address the remaining issues in this case.

SIGNED on July 25, 2017, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge